GARY M. RESTAINO
United States Attorney
District of Arizona

M. BRIDGET MINDER
Assistant United States Attorney
Arizona State Bar No. 23356
AMY C. CHANG
Assistant United States Attorney
Arizona State Bar No. 27566
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, Arizona 85004
Telephone: 602-514-7500
Email: mary.minder@usdoj.gov
Email: amy.chang@usdoj.gov
*Attorneys for Plaintiff*

FILED ___ LODGED
RECEIVED ___ COPY
MAY 24 2022
CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY _____ DEPUTY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

**SEALED**

| | |
|---|---|
| United States of America,<br><br>　　　　　Plaintiff,<br><br>　vs.<br><br>Bessie Louise Derkes,<br><br>　　　　　Defendant. | No. CR22-550-PHX-SMB (ESW)<br><br>**INDICTMENT**<br><br>VIO: 18 U.S.C. § 371<br>(Conspiracy)<br>Count 1<br><br>18 U.S.C. § 1341<br>(Mail Fraud)<br>Count 2<br><br>18 U.S.C. § 1343<br>(Wire Fraud)<br>Counts 3-21<br><br>18 U.S.C. § 1029(a)(2), (b)(1) & (c)(1)(a)(i)<br>(Access Device Fraud)<br>Count 22<br><br>18 U.S.C. § 1028A<br>(Aggravated Identity Theft)<br>Counts 23-24 |

///

///

**THE GRAND JURY CHARGES:**

At all times material to this Indictment, within the District of Arizona and elsewhere:

1. Defendant BESSIE LOUISE DERKES, a resident of Scottsdale, Arizona, conspired and schemed with others to launder the proceeds of online fraud schemes conducted by her co-conspirators. To further the conspiracy and conceal the nature, location, source, ownership, and control of the proceeds of the online fraud schemes, DERKES gave false information to federal agents on multiple occasions when they attempted to speak with her regarding the suspicious financial transactions occurring in her accounts.

**COUNT 1**
**Conspiracy**
**18 U.S.C. § 371**

2. Starting by at least January 2017, and continuing through at least June 2021, in the District of Arizona and elsewhere, defendant DERKES knowingly and willfully conspired with other persons known and unknown to the grand jury to commit the following offenses against the United States: 18 U.S.C. § 1341 (Mail Fraud), 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1956(a)(1)(B)(i) & (a)(2)(B)(i) (Money Laundering), 18 U.S.C. § 1957 (Transactional Money Laundering), 18 U.S.C. § 1028A (Aggravated Identity Theft), 18 U.S.C. § 1029(a)(2), (b)(1) & (c)(1)(a)(i) (Access Device Fraud), and 18 U.S.C. § 1001 (False Statements).

**Manner and Means of the Conspiracy**

3. DERKES' co-conspirators stole money and credit card numbers from numerous victims through various online fraud schemes, including Business Email Compromise (BEC) and romance schemes. Initially, DERKES may have been a victim of an online fraud scheme perpetrated by her co-conspirators and may have unknowingly assisted them in stealing and laundering the proceeds of their online fraud schemes.

4. By at least January 2017, however, DERKES joined the conspiracy and knowingly assisted her co-conspirators in stealing and laundering money that they fraudulently obtained from victims. DERKES opened numerous bank accounts and allowed fraudulently obtained money to be deposited into those accounts. DERKES then sent the funds to her co-conspirators through various methods or allowed co-conspirators access to her bank accounts so they could transfer the fraudulently obtained funds. DERKES also used credit card numbers stolen by her co-conspirators to make unauthorized purchases. When confronted by federal agents about her suspicious financial transactions, DERKES gave false information on multiple occasions.

5. Between approximately January 2017 and June 2021, DERKES assisted her co-conspirator(s) in stealing or laundering more than approximately $800,000.

**Overt Acts**

6. In furtherance of the conspiracy and to effect the objects of the conspiracy, the following overt acts, among others, were committed in the District of Arizona and elsewhere:

   a. Between July 2015 and May 2019, DERKES opened at least 21 different bank accounts at nine or more different banks in Arizona in her own name and in the name of her business, Gold Rush Designs. Many of the bank accounts DERKES opened were closed by the banks within a few months because of suspicious transactions occurring in her accounts.

   b. Starting by at least January 2017, and continuing through at least February 2019, DERKES sent or attempted to send approximately $95,000 to individuals in the United States and elsewhere (primarily the United Arab Emirates and Nigeria) through money transfer services, including Continental Exchange Solutions, Western Union, and MoneyGram.

   c. In November 2017, DERKES received multiple wire transfers totaling approximately $173,000 from R.S. into her National Bank of Arizona business bank account, which she opened on or about November 8, 2017. Within a few days of receiving

each wire transfer from R.S., DERKES withdrew the funds in cash or the funds were transferred to another account. R.S. believed he was sending the money to "Kiesha," a woman he met through an online dating site; "Kiesha" told R.S. that the Gold Rush Designs bank account belonged to her brother.

        d.      When National Bank of Arizona closed DERKES' accounts in December 2017, following the suspicious transactions with R.S., DERKES opened a business bank account at First Fidelity Bank. Shortly before opening the account at First Fidelity Bank, DERKES also opened business and personal bank accounts at Johnson Bank.

        e.      On or about January 24, 2018, DERKES received a $50,000 wire transfer from S.S. into her First Fidelity business bank account. The wire details for the transfer said "Purpose: Payment for Services." The next day, DERKES withdrew $49,093 in cash from the account. S.S. thought she was sending the money to "Chris," a man she met through an online dating site; "Chris" directed S.S. to put "payment for services" as the purpose of the wire transfer.

        f.      In February and March 2018, DERKES opened new bank accounts in her name and in the name of her business, Gold Rush Designs, at Desert Financial Credit Union (DFCU) in Scottsdale, Arizona. DERKES told the bank she was opening the accounts for her business selling saddles and other horse-related gear.

        g.      On March 1, 2018, Special Agents from the Federal Bureau of Investigation (FBI) visited DERKES to ask about the transfers from R.S. in November 2017. DERKES provided false information to FBI Agents about her financial transactions and banking activity. FBI Agents informed DERKES she may have been a party to financial transactions that involved the proceeds of criminal activity and warned her that if she continued to engage in such transactions, she may be facilitating a fraudulent scheme and assisting the perpetrators of the scheme.

        h.      On or about March 5, 2018, DERKES deposited a check from B.E. in the amount of $12,000 into her First Fidelity business bank account. Prior to this deposit,

DERKES' account had a balance of approximately $74.90. On March 7, 2018, DERKES withdrew $4,750 in cash from her First Fidelity business bank account. The next day, March 8, 2018, the $12,000 check from B.E. was returned and the deposit reversed. Around the same time, B.E. learned her bank account had been compromised and her mail forwarded to Arizona without her knowledge or consent; B.E. also was notified by her bank of a charge to her account for "jewelry" from Gold Rush Designs in Arizona, which B.E. did not authorize. Within a few months, DERKES' account at First Fidelity Bank was closed.

      i.      On or about March 9, 2018, DERKES received an $8,000 wire transfer from L.B. into her personal account at Johnson Bank. The "originator to beneficiary info" for the transfer said "FAMILY SUPPORT." A few days later, on or about March 13, 2018, DERKES withdrew $7,000 in cash from the account. L.B. thought she was sending the money to "Wilson," a man she met through an online dating site; "Wilson" told L.B. that DERKES was his friend.

      j.      On or about March 20, 2018, an individual posing as an executive of a non-profit hospital in Michigan sent emails to the hospital's finance director, requesting she immediately transfer approximately $80,135 to DERKES' business account at Johnson Bank. DERKES' business and personal accounts at Johnson Bank were closed in March 2018.

      k.      In late March 2018, DERKES opened a business bank account at Comerica Bank. In mid-April 2018, DERKES opened a personal bank account at Comerica Bank.

      l.      In April 2018, DERKES received a check and multiple wire transfers totaling approximately $49,500 from D.B. into her business and personal bank accounts at DFCU, which she opened in February and March 2018, including:

            i.      On or about April 4, 2018, DERKES deposited a check in the amount of $8,500 from D.B. into her personal bank account at DFCU. Within a few days, the check was returned and the deposit reversed.

    ii. On or about April 23, 2018, DERKES received a wire transfer in the amount of $5,000 from D.B. into her business bank account at DFCU. On or about the same day, DERKES withdrew $5,000 cash from the same account.

    iii. On or about April 23, 2018, DERKES received two wire transfers from D.B. in the amount of $2,000 each, for a total of $4,000, into her personal bank accounts at DFCU. On or about the same day, DERKES withdrew a total of $3,990 cash from the same accounts.

    iv. On or about April 24, 2018, DERKES received a wire transfer from D.B. in the amount of $32,000 into her business bank account at DFCU. On or about the same day, DERKES withdrew $10,000 cash from the same account. On or about the next day, DERKES attempted to wire $21,000 to K.I. in the United Arab Emirates (UAE). DERKES told the bank the wire to UAE was for purchasing products but could not provide any invoices or other supporting documentation.

    v. On or about May 11, 2018, DFCU closed DERKES' bank accounts and issued her a cashier's check, payable to DERKES, in the amount of $22,642.40, which she deposited into her recently opened personal bank account at Comerica Bank.

D.B. thought he was sending the money to "Carolina," a woman he met through an online dating site; "Carolina" told D.B. that DERKES was a friend and directed D.B. to put "chaps" and "saddles" on the notes for the wire transfer requests because DERKES' business specialized in high-end western goods.

  m. In May 2018, DERKES received four wire transfers from W.S. totaling approximately $51,126.51 (before wire transfer fees were deducted) into her personal bank account at Comerica Bank, including:

    i. A wire transfer in the amount of $11,500 (minus a $22 wire transfer fee) from W.S. to DERKES sent on or about May 4, 2018.

          ii.    A wire transfer in the amount of $14,420 (minus a $22 wire transfer fee) from W.S. to DERKES sent on or about May 8, 2018.

          iii.    A wire transfer in the amount of $7,900 (minus a $22 wire transfer fee) from W.S. to DERKES sent on or about May 9, 2018.

          iv.    A wire transfer in the amount of $17,306.51 (minus a $22 wire transfer fee) from W.S. to DERKES sent on or about May 10, 2018.

Some of the money was returned to W.S. on or about May 31, 2018, before DERKES' accounts at Comerica Bank were closed on or about June 1, 2018 for possible fraud. W.S. believed he was sending the money to "Diane," a woman he met through an online dating site.

    n.    Around the same time she received the wire transfers from W.S., DERKES made several large cash withdrawals from her personal bank account at Comerica Bank, including:

          i.    On or about May 7, 2018, a cash withdrawal in the amount of $11,478.

          ii.    On or about May 10, 2018, a cash withdrawal in the amount of $20,000.

          iii.    On or about May 15, 2018, a cash withdrawal in the amount of $10,000.

    o.    On or about May 15, 2018, DERKES opened business and personal bank accounts at First Convenience Bank.

    p.    On or about May 31, 2018, DERKES received a check from L.B. in the amount of $4,400, which DERKES deposited in her personal bank account at First Convenience Bank. As noted above, L.B. believed she was in a romantic relationship with "Wilson." "Wilson" used an account on which L.B. was a signer to issue the check to DERKES, without L.B.'s knowledge or consent.

    q.    On or about August 11, 2018, DERKES received a cashier's check from A.F. in the amount of $25,000, which DERKES deposited in her business bank

account at First Convenience Bank. The next day, on or about August 12, 2018, DERKES withdrew $5,000 cash from the same account. A few days later, on or about August 14, 2018, DERKES withdrew $20,000 cash from the same account.

   r. Between approximately July 2018 and October 2018, DERKES received eight wire transfers totaling approximately $26,100 from L.O. into her personal bank account at First Convenience Bank, including:

    i. A wire transfer in the amount of $2,200 from L.O. to DERKES sent on or about July 18, 2018.

    ii. A wire transfer in the amount of $2,000 from L.O. to DERKES sent on or about July 23, 2018.

    iii. A wire transfer in the amount of $3,500 from L.O. to DERKES sent on or about July 23, 2018.

    iv. A wire transfer in the amount of $12,000 from L.O. to DERKES sent on or about August 1, 2018.

    v. A wire transfer in the amount of $2,400 from L.O. to DERKES sent on or about August 7, 2018.

    vi. A wire transfer in the amount of $2,500 from L.O. to DERKES sent on or about September 7, 2018.

    vii. A wire transfer in the amount of $1,000 from L.O. to DERKES sent on or about October 19, 2018.

    viii. A wire transfer in the amount of $500 from L.O. to DERKES sent on or about October 31, 2018.

L.O. believed he was sending the money to "Cynthia," a woman he met online through a dating site, and her aunt, "Betsy."

   s. On or about August 3, 2018, DERKES made a cash withdrawal in the amount of $11,800 from her personal bank account at First Convenience Bank, the same account into which she was receiving wire transfers from L.O. around the same time.

t.  On or about December 24, 2018, DERKES received a wire transfer from S.M. in the amount of $92,000 into her business bank account at First Convenience Bank. The wire transfer information indicated the transfer was for "remodeling." S.M. believed she was sending the money to "Michael" at Gold Rush Designs for the purpose of remodeling her home.

u.  Over the next couple of weeks, in Arizona, DERKES attempted to transfer approximately $52,025 of the funds from S.M. and ultimately withdrew approximately $84,000 of the funds from S.M. in multiple transactions originating from her business bank account at First Convenience Bank, including:

i.  A cash withdrawal in the amount of $10,000 on or about December 26, 2018.

ii.  A wire transfer to J.E. in the amount of $52,025 on or about December 26, 2018. The wire transfer information indicated the transfer was for "buying condo from private seller." This transfer was cancelled by the bank on or about December 31, 2018. J.E. was unaware of the attempted wire transfer from DERKES and believed that (a) she (J.E.) was in a romantic relationship with D.B., (b) D.B. lived in the United Arab Emirates, (c) DERKES was D.B.'s secretary, and (d) D.B. directed her (J.E.) to conduct various financial transactions, including some with DERKES.

iii.  A cash withdrawal in the amount of $22,000 on or about January 2, 2019.

iv.  A cash withdrawal in the amount of $52,000 on or about January 9, 2019.

DERKES' accounts at First Convenience Bank were closed a short time later, in February 2019.

v.  In mid-January 2019, DERKES opened a new personal bank account at BBVA Compass Bank. DERKES previously held personal and business accounts at BBVA Compass which were closed in August 2016.

w.  On or about February 12, 2019, DERKES received three cashier's checks from J.R. in the amount of $10,000 each for a total of $30,000, which DERKES deposited in her newly-opened personal bank account at BBVA Compass Bank. On or about February 20, 2019, DERKES made a wire transfer from the same account, transferring $12,690 to Company-1, an online retailer of luxury watch brands such as Rolex. J.R. thought she was sending the money to "James," a man she met through an online dating site, to help with his business expenses.

x.  On or about March 6, 2019, DERKES received a wire transfer from L.O. in the amount of $1,500 into her personal bank account at BBVA Compass Bank.

y.  On or about March 14, 2019, in Arizona, DERKES falsely told Special Agents from the Federal Bureau of Investigation that she was no longer in contact with her co-conspirators and knew nothing about the December 24, 2018 wire transfer in the amount of $92,000 from S.M. into her bank account, among other things.

z.  On or about May 24, 2019, DERKES opened personal and business bank accounts at TCF National Bank.

aa.  On or about May 24, 2019, DERKES received a cashier's check from J.E. in the amount of $10,000, which DERKES deposited in her newly-opened personal bank account at TCF National Bank. The next week, on or about June 3, 2019, DERKES withdrew $8,200 from the same account. On or about the same day, from the same account, DERKES incurred charges totaling approximately $1,823.85 at SSENSE.com (an online retailer specializing in designer fashion and high-end streetwear) and Nintendo.

bb.  On or about June 18, 2019, in Arizona, DERKES provided false information to Special Agents from the Federal Bureau of Investigation about her suspicious financial transactions and online activities, among other things.

cc.  On or about August 7, 2019, DERKES created an account with Coinbase using the email blderkes@gmail.com. Coinbase is an online cryptocurrency exchange platform.

dd.  On or about March 10, 2020, DERKES attempted to purchase approximately $3,116.12 of electronics and other goods at a Best Buy in Scottsdale, Arizona, using a stolen credit card belonging to W.Y., a resident of Colorado.

    i.  A few days earlier, on or about March 5-6, 2020, W.Y.'s stolen credit card number was used to attempt to make online purchases at multiple retailers totaling approximately $7,240.

    ii.  Shortly before the fraudulent charges, W.Y.'s online banking account was accessed without W.Y.'s permission; the mailing address for W.Y.'s account was changed to DERKES' address, and a replacement credit card was sent to DERKES in Scottsdale, Arizona.

ee.  In or around March 2020, the online credit card account for W.Y.'s father, W.A.Y., also was accessed without W.A.Y.'s permission, the mailing address for W.A.Y.'s account was changed to DERKES' address, and a replacement credit card was sent to DERKES in Scottsdale, Arizona.  W.A.Y.'s credit card also was used to attempt to make unauthorized purchases.

ff.  On or about March 30, 2020, DERKES created another account with Coinbase, this time using the email grdariz@gmail.com.

gg.  On or about June 9, 2021, DERKES created an account with a company that operates Bitcoin ATMs in Arizona and elsewhere.

    i.  Starting the same day, and for the next two days, DERKES made multiple purchases of Bitcoin totaling approximately $28,800 at a Bitcoin ATM in Scottsdale, Arizona.

    ii.  DERKES then attempted to transfer the Bitcoin she purchased to various wallets.

    iii.  When the company that operates the Bitcoin ATM contacted DERKES about the transactions, DERKES stated she was purchasing Bitcoin using her "Personal Savings" to "Make an Investment."

    iv.  When the company asked DERKES to send three months of official bank statements to verify the source of her funds, DERKES said "I haven't had a bank acct for years because I got hacked many times and lost too much money. I work with cash now and wanted to invest. If this transaction will not be approved, I need the money back."

All in violation of 18 U.S.C. § 371.

## COUNT 2
## Mail Fraud
## 18 U.S.C. § 1341

7. The factual allegations above are incorporated in Count 2.

8. Starting at least by January 2017, and continuing through at least June 2021, in the District of Arizona and elsewhere, DERKES, with the intent to defraud, devised and willfully participated in, with knowledge of its fraudulent nature, a scheme to defraud and obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

9. On or about March 11, 2020, in the District of Arizona, for the purpose of executing or attempting to execute the above-described scheme and artifice to defraud and deprive, DERKES knowingly caused to be delivered by mail, according to the direction thereon, at the place at which it was directed to be delivered by the person to whom it was addressed, the following matter: an American Express credit card issued to W.A.Y.

All in violation of 18 U.S.C. § 1341.

## COUNTS 3-21
## Wire Fraud
## 18 U.S.C. § 1343

10. The factual allegations above are incorporated in Counts 3-21.

11. Starting at least by January 2017, and continuing through at least June 2021, in the District of Arizona and elsewhere, DERKES, with the intent to defraud, devised and willfully participated in, with knowledge of its fraudulent nature, a scheme to defraud and

obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

12. On or about each of the dates set forth below, in the District of Arizona and elsewhere, DERKES, for the purpose of executing or attempting to execute the above-described scheme, caused to be transmitted by means of wire communication in interstate commerce the signals and sounds associated with the wire transfers between bank accounts described below for each count, each transmission constituting a separate count:

| Count | Date | Sender | DERKES' Receiving Account | Wire Amount | Originator to Beneficiary Info. |
|---|---|---|---|---|---|
| 3 | 3/9/2018 | L.B. | Johnson Bank (x8364) | $8,000 | FAMILY SUPPORT |
| 4 | 4/23/2018 | D.B. | DFCU (x5533_0400) | $5,000 | CHAP |
| 5 | 4/23/2018 | D.B. | DFCU (x8584_0000) | $2,000 | CHAPS |
| 6 | 4/23/2018 | D.B. | DFCU (x8584_0400) | $2,000 | SADDLES |
| 7 | 4/24/2018 | D.B. | DFCU (x5533_0400) | $32,000 | SERVICES |
| 8 | 5/4/2018 | W.S. | Comerica (x2840) | $11,500 | |
| 9 | 5/8/2018 | W.S. | Comerica (x2840) | $14,420 | |
| 10 | 5/9/2018 | W.S. | Comerica (x2840) | $7,900 | CHECKING ACCOUNT |
| 11 | 5/10/2018 | W.S. | Comerica (x2840) | $17,306.51 | QIRA [x]6611 FOR DIANE MCCARTY |
| 12 | 7/18/2018 | L.O. | First Convenience (x8379) | $2,200 | SENDING MONEY TO A FRIEND |

| Count | Date | Sender | DERKES' Receiving Account | Wire Amount | Originator to Beneficiary Info. |
|---|---|---|---|---|---|
| 13 | 7/23/2018 | L.O. | First Convenience (x8379) | $2,000 | SENDING MONEY TO A FRIEND |
| 14 | 7/23/2018 | L.O. | First Convenience (x8379) | $3,500 | SENDING MONEY TO A FRIEND |
| 15 | 8/1/2018 | L.O. | First Convenience (x8379) | $12,000 | SENDING MONEY TO A FRIEND |
| 16 | 8/7/2018 | L.O. | First Convenience (x8379) | $2,400 | SENDING MONEY TO A FRIEND |
| 17 | 9/7/2018 | L.O. | First Convenience (x8379) | $2,500 | SENDING MONEY TO A FRIEND |
| 18 | 10/19/2018 | L.O. | First Convenience (x8379) | $1,000 | SENDING MONEY TO A FRIEND |
| 19 | 10/31/2018 | L.O. | First Convenience (x8379) | $500 | SENDING MONEY TO A FRIEND |
| 20 | 12/24/2018 | S.M. | First Convenience (x2065) | $92,000 | REMODELING |
| 21 | 3/6/2019 | L.O. | BBVA Compass (x7533) | $1,500 | SENDING MONEY TO A FRIEND |

All in violation of 18 U.S.C. § 1343.

### COUNT 22
**Access Device Fraud**
**18 U.S.C. § 1029(a)(2), (b)(1) & (c)(1)(a)(i)**

13. The factual allegations above are incorporated in Count 22.

14. Starting by at least March 5, 2020, and continuing until at least March 10, 2020, in the District of Arizona and elsewhere, DERKES knowingly and with intent to defraud used and trafficked in unauthorized access devices, to wit stolen credit card numbers belonging to W.Y. and W.A.Y., and by such conduct obtained or attempted to

obtain anything of value worth $1,000 or more, said use and trafficking affecting interstate commerce, in that W.Y. and W.A.Y. are residents of Colorado and the stolen credit card numbers were issued by financial institutions outside Arizona.

All in violation of 18 U.S.C. § 1029(a)(2), (b)(1), and (c)(1)(a)(i).

**COUNTS 23-24**
**Aggravated Identity Theft**
**18 U.S.C. § 1028A**

15. The factual allegations above are incorporated in Counts 23-24.

16. On or about the dates below, in the District of Arizona, DERKES knowingly possessed and used, without lawful authority, a means of identification of another person, to wit credit card numbers, during and in relation to felony violations enumerated in 18 U.S.C. § 1028A(c), to wit 18 U.S.C. §§ 1029(a)(2) & 1343, knowing that the means of identification belonged to another actual person.

| Count | Date | Stolen Credit Card Belonging to |
|---|---|---|
| 23 | 3/9/2020 | W.A.Y. |
| 24 | 3/10/2020 | W.Y. |

All in violation of 18 U.S.C. § 1028A.

A TRUE BILL

/S/
FOREPERSON OF THE GRAND JURY
Date: May 24, 2022

GARY M. RESTAINO
United States Attorney
District of Arizona


/S/
M. BRIDGET MINDER
AMY C. CHANG
Assistant U.S. Attorneys